**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| HUEYLI LI, | ) | Case No. 5:21-CV-02277 |
| | ) | |
| Plaintiff, | ) | JUDGE LIOI |
| | ) | |
| -vs- | ) | |
| | ) | |
| UNIVERSITY OF AKRON, | ) | |
| | ) | |
| Defendant. | ) | |

---

**MOTION FOR SUMMARY JUDGMENT OF**
**DEFENDANT UNIVERSITY OF AKRON**

---

DAVE YOST (0056290)
Attorney General of Ohio

Drew C. Piersall (0078085)
Sarah J. Moore (0065381)
ZASHIN & RICH CO., L.P.A.
950 Main Avenue, 4th Floor
Cleveland, OH 44113
Telephone: (216) 696-4441
Facsimile: (216) 696-1618
*dcp@zrlaw.com*
*sjm@zrlaw.com*

*Attorneys for Defendant University of Akron*

**MOTION FOR SUMMARY JUDGMENT OF DEFENDANT UNIVERSITY OF AKRON**

Pursuant to Federal Rule of Civil Procedure 56, Defendant University of Akron moves for summary judgment on the sole claim Plaintiff Hueyli Li asserted against it:  national origin and/or race discrimination under Title VII of the Civil Rights Act of 1964.  As explained in the memorandum in support that follows, no material issues of disputed fact exist, and Defendant is entitled to judgment as a matter of law on Plaintiff's claim.

Respectfully submitted,

DAVE YOST (0056290)
Attorney General of Ohio

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)
Sarah J. Moore (0065381)
ZASHIN & RICH CO., L.P.A.
950 Main Avenue, 4th Floor
Cleveland, OH 44113
Telephone: (216) 696-4441
Facsimile: (216) 696-1618
*dcp@zrlaw.com*
*sjm@zrlaw.com*

*Attorneys for Defendant University of Akron*

# TABLE OF CONTENTS

MOTION FOR SUMMARY JUDGMENT OF DEFENDANT UNIVERSITY OF AKRON ....... i

TABLE OF AUTHORITIES ........................................................................................... ii

MEMORANDUM IN SUPPORT ..................................................................................... 1

I.        Introduction................................................................................................... 1

II.       Statement of Facts....................................................................................... 2

      A.    Plaintiff's Employment History.......................................................... 2

      B.    UA's Dire Financial Circumstances. ................................................... 4

      C.    Tudor Recommends Six LJFFSE Faculty Positions for Elimination in the RIF. ........ 5

      D.    UA's Rationale for Selecting Plaintiff's Position for the RIF ..................... 7

III.     Law & Argument. ......................................................................................... 9

      A.    Plaintiff Cannot Establish the Fourth Prong of her *prima facie* Case.......................... 9

      B.    Plaintiff Cannot Demonstrate That UA's Legitimate Non-Discriminatory Reasons for her RIF are Pretextual. ......................................................................... 12

IV.     Conclusion. ................................................................................................. 16

CERTIFICATE OF SERVICE ....................................................................................... 17

i

# TABLE OF AUTHORITIES

**Cases**

*Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1465 (6th Cir.), *cert. denied*, 498 U.S. 878 (1990).... 10

*EEOC v. Lucent Technologies, Inc.*, 226 Fed. Appx. 587, 591 (6th Cir. 2007) ..................... 13, 14

*Heyward v. CDM Smith, Inc.*, 2015 U.S. Dist. LEXIS 103314, *9 (E.D. Tenn. Aug. 5, 2015)... 11

*Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 662 (6th Cir. 1999)......................................... 12

*Jones v. Fluor Fernald, Inc.*, 216 Fed. Appx. 461 (6th Cir. 2006)......................................... 12, 13

*Manzer v. Diamond Shamrock Chems., Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) ...................... 13

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ........................................................... 9

*Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018)...................................................... 10

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)................................... 13

*Slapak v. Tiger Management Group, LLC*, 594 Fed. Appx. 290, 295 (6th Cir. 2014)................ 11

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) .......................................................... 12

*Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016).................................... 10

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981) ....................................... 9, 12

**Statutes**

O.R.C. §124.321(D).......................................................................................................................... 7

Title VII of the Civil Rights Act of 1964......................................................................................... i

**Rules**

Fed. R. Civ. P. 56............................................................................................................................. i

**MEMORANDUM IN SUPPORT**

## I.      <u>Introduction.</u>

The COVID-19 pandemic had a colossal impact on Defendant, the University of Akron ("UA"), resulting in a forecasted $65 million structural budget deficit in UA's 2020-2021 fiscal year ("FY 2021")  (Ex. I, p.22; Li Dep. 64-65). Consequently, on July 15, 2020, the UA Board of Trustees approved the elimination of 178 positions through a campus-wide reduction in force ("RIF").  (Exs. E (non-faculty positions) and F (bargaining faculty positions)).  The RIF included UA's abolishment of 96 bargaining unit faculty positions, including Plaintiff's position, pursuant to Article 15, titled "*Retrenchment,*" of the collective bargaining agreement ("CBA") between UA and the American Association of University Professors ("AAUP").  (Ex. G).

At the time of UA's RIF decision on July 15, 2020, Plaintiff was a faculty member in UA's LeBron James Family Foundation School of Education ("LJFFSE").  Prior to July 1, 2020, LJFFSE had been one of 11 separate "Colleges" within UA.  In order to begin addressing the $65M structural budget deficit, UA consolidated from 11 Colleges to 5 Colleges; accordingly, LJFFSE was subsumed into UA's Buchtel College of Arts and Sciences ("BCAS").  LJFFSE's outgoing Interim Dean, Dr. Jarrod Tudor ("Dr. Tudor" or "Tudor"), recommended Plaintiff's position for inclusion in the RIF for simple and indisputable reasons: (1) she was no longer affiliated with an academic program; (2) she had one of the highest salaries in LJFFSE; and, (3) she had limited teaching versatility -- she taught foundational courses that could be readily staffed within the remaining LJFFSE faculty workloads.  (Ex. L; Ex. 3, ¶11-18).  There is no genuine, material dispute concerning UA's rationale for abolishing Plaintiff's position.

Plaintiff contends the RIF of her position constituted national origin and/or race discrimination.  Plaintiff cannot establish the heightened evidence standard required in a RIF *prima*

*facie* case to demonstrate that UA <u>intentionally</u> chose to eliminate her position based on her national origin and/or her race. Even if such evidence existed, UA had legitimate non-discriminatory business reasons for its decisions and no evidence of pretext exists. UA is entitled to summary judgment as a matter of law on Plaintiff's claim.

## II.   **Statement of Facts**.

### A.   **Plaintiff's Employment History.**

Plaintiff, Dr. Hueyli Li, was a faculty member in UA's Lebron James Family Foundation School of Education ("LJFFSE" or the "College") from August 1995 until her position was eliminated effective August 21, 2020. (Li Dep. 36-39, 56; Ex. D).[1] Plaintiff started as a tenure-track "Assistant Professor of Educational Foundations." (Li Dep. 36; Ex. A). She obtained tenure in 2000, along with a promotion in rank to Associate Professor. (Li Dep. 36-37). UA promoted Plaintiff to the rank of Full Professor in 2005. (Li Dep. 36). Dr. Li's enjoys a narrow area of expertise: "Social and Philosophical Foundations of Education." (Tudor Dep. 21-22; Li Dep. 34)

Initially, Dr. Li was affiliated with the "Department of Educational Foundations and Leadership" (hereinafter, "EFL"), one of several departments within LJFFSE. By 2019, the College had downscaled to just two departments: EFL and "Curricular and Instructional Studies" ("CIS"). (Lenhart Dep. 29). Although EFL remained a separate department from CIS, EFL faculty members taught courses in the curriculum for CIS's degree programs. (Tudor Dep. 40).

In 2019, UA appointed Dr. Lisa Lenhart ("Dr. Lenhart" or "Lenhart") as Department Chair. (Lenhart Dep. 6-7; Tudor Dep. 38). Dr. Tudor, who served as Acting Dean and then Interim Dean

---

[1] Defendant conducted the deposition of Plaintiff. (ECF#26). Plaintiff conducted the depositions of Jarrod Tudor (ECF#24) and Lisa Lenhart. (ECF#25). Citations to deposition transcripts and associated exhibits filed with the Court are cited herein as "Deponent Last Name, Dep. __," with referenced page numbers of the transcript. Citations to associated deposition exhibits are cited herein as "Ex. __."

of LJFFSE from 2017 to 2020, explained that at least one year prior to the RIF on July 15, 2020, the EFL Department was wholly defunct: LJFFSE only had one Department (the CIS Department), which it then converted to a "School" within BCAS. (Tudor Dep. 13-14, 37-38). Dr. Tudor was right: the LJFFSE faculty voted to combine the EFL and CIS Departments on September 28, 2018. (Tudor Declaration, ¶10; Declaration Ex. B).

Plaintiff received a nine-month appointment from UA each academic year. (Li Dep. 47-48). Plaintiff's final appointment covered the 2019-2020 academic year at a base salary of $96,852.00. (Li Dep. 46-47; Ex. C). Inclusive of benefits, Plaintiff's total compensation was $129,808.83. (Li Dep. 120; Ex. L).

At the time of the RIF, Dr. Li regularly taught only two courses: an undergraduate (200-level) "Introduction to Education" course, and a graduate (600-level) "Philosophy of Education Course." (Li Dep. 48, 51-54; Lenhart Dep. 14-15). The former was an introductory, "foundational" course for all students interested in a teaching major. (Li Dep. 52; Ex. 3, ¶14). Plaintiff taught these two courses each semester for several years preceding the RIF. (Li Dep. 53).

As Department Chair, Dr. Lenhart had responsibility for creating class schedules and assigning UA faculty to teach courses. (Lenhart Dep. 10). Based on Plaintiff's narrow specialization area, Dr. Lenhart could not easily generate a full course load for Plaintiff. (Lenhart Dep. 14; Tudor Dep. 20, 26).[2] Indeed, the "Philosophy of Education" course Plaintiff taught supported only one degree of the School's Master's program, and had "only a few students in it." *Id.* The elimination of Plaintiff's position did not present any course scheduling problems to the Department. (Lenhart Dep. 15).

---

[2] As Dr. Lenhart succinctly stated: "I think we know that [Introduction to Education] is a course that if someone needs another course we can always put them in the [Introduction to Education] class." (Lenhart Dep. 21).

**B.      UA's Dire Financial Circumstances.**

Although UA had utilized its reserves to address the structural deficit in past years, the financial impact of the COVID-19 pandemic created a catastrophic circumstance – a dire and immediate $65-million structural budget deficit for FY 2021 - that could not be addressed by using UA's cash reserves and that required significant multi-million expenditure reduction.  (Ex. I, pp. 22-23).

By May 6, 2020, less than two months after Governor DeWine issued Executive Order 2020-01(D) declaring a state of emergency in Ohio due to COVID-19, *UA projected the $65-million budget deficit for FY21. Id.* For context, UA had to reduce its operating budget by approximately 20% and realize that savings to balance its finances by the end of FY 2021. *Id*. UA's credit rating was at risk, "the loss of which could imperil the viability of the University." (Ex. I, p. 23).

UA's Board of Trustees took drastic action in response, including: (1) Resolution 5-1-20 (Consolidation of 11 colleges to 5 colleges) (Ex. D); (2) Resolution 5-5-20 (Reduction in FY21 compensation to non-bargaining unit staff, contract professionals, and senior administrators; (3) Resolution 5-6-20 (Increase to employee monthly health care premium contributions for non-bargaining staff, contract professionals, and senior administrators); (4) Resolution 5-7-20 (Elimination of all retiree dependent health insurance benefits for non-bargaining unit employees); (5) Resolution 6-14-20 (Reduction  FY21 compensation of non-bargaining unit faculty and academic administrators with faculty rank); (6) Resolution 6-15-20 (Increase to employee monthly health care premium contributions for non-bargaining unit faculty and academic administrators with faculty rank); (7) Resolution 7-6-20 (Elimination of 82 non-bargaining unit positions campus-

wide) (Ex. E); and (8) Resolution 7-7-20 (Elimination of 96 AAUP bargaining unit positions campus-wide, including the position held by Plaintiff) (Ex. F).  (Tudor Dec., ¶5).  A summary of the pre-RIF actions taken by UA to reduce its budget is contained in both Exhibits E and F.

What was formerly the "LeBron James Family Foundation *College* of Education" (emphasis added), was converted to a "School" and subsumed into the BCAS, effective July 1, 2020. (Li Dep. 43, 67; Ex. D, p.2; Ex. 3, ¶3).  Within LJFFSE, one Department existed as a result of the departmental merger process that had begun in September 2018. (Tudor Dec., ¶10; Dec. Ex. B; Li Dep. 43)  LJFFSE's transition to a "School" within BCAS had no impact on Tudor's RIF decision-making process. (Tudor Dep. 10).

### C.    Tudor Recommends Six LJFFSE Faculty Positions for Elimination in the RIF.

In Spring 2020, UA Provost John Wiencek directed that <u>all</u> academic units, including LJFFSE, examine their operating budgets and recommend a revised budget for FY 2021 that would result in an approximate 25% budget reduction over the previous fiscal year.  (Ex. 3, ¶2; Tudor Dep. 10-11).  At the time of the RIF, personnel costs constituted the largest expense at LJFFSE. (Ex. 3, ¶5).

The Provost tasked LJFFSE's Interim Dean, Dr. Tudor, to cut 25% from the faculty personnel line item in the LJFFSE budget.  (Tudor Dep. 10-11).  Tudor made recommendations to the Provost regarding his RIF selections. (Tudor Dep. 8).  Dr. Tudor resigned his position at UA in summer 2020 to pursue a higher education opportunity.  (Tudor Dep. 7; Tudor Dec. ¶2). Although the RIF had yet to be fully implemented at the time Dr. Tudor stepped down as Interim Dean, the Provost adopted all of Dr. Tudor's recommendations.  (Tudor Dep. 8-9).  As Dr. Tudor confirmed, he took ownership of the RIF selection process, but did "bounce ideas off of Dr. Lenhart who was also the acting chair."  (Tudor Dep. 9; Lenhart Dep. 10-11).  Dr. Tudor also

consulted with Dr. Lenhart to ensure the School had adequate faculty coverage for class schedules upon the RIF's implementation. (Lenhart Dep. 10).

As Dr. Tudor explained, "[W]e had a financial target that we had to make. We wanted to try to preserve as many faculty as we possibly could, and so what I would run by [Dr. Lenhart was] is this going to work? I mean can we put a schedule together? Will this work?" (Tudor Dep. 35).  Drs. Tudor and Lenhart "looked at what the core functions of the [LJFFSE] would be moving forward, again, with all those programs that we had eliminated. We looked at the ones that are the most significant, early childhood, special ed[ucation], middle level, AYA, and what can we put together and still meet the financial target in the end." (Tudor Dep. 44-45)

LJFFSE's goal was "impacting as few employees as possible, but we knew that not all positions could be saved."  (Ex. 3, ¶7).  In order to achieve the cost-reduction target, Dr. Tudor initially considered eliminating all Non-Tenure Track positions. (Lenhart Dep. 34).  Dr. Lenhart quickly dismissed this notion as it would "wipe out" the School's entire reading program.  *Id.* Ultimately, Dr. Tudor selected six positions to eliminate, after closely examining "which faculty were still associated with a program, what courses the faculty taught, teaching versatility, and salary/compensation level."  (Ex. 3, ¶19)

The six positions Dr. Tudor identified for the  were held by Nasser Razek, Brandi Noll, Evonn Welton, I-Chun Tsai, Sandra Coyner, and Plaintiff. (Li Dep. 75; Tudor Dep. 27-30).[3] Evonn Welton and Sandra Coyner elected to retire, resulting in elimination of their positions through attrition.  (Li Dep. 77).  In addition, another LJFFSE faculty member (Kristin Koskey) resigned to accept another position, which allowed LJFFSE to "recall" one of the six positions that

---

[3] To Plaintiff's knowledge, Razek is Egyptian (race unknown), Noll is Caucasian and American, Welton is Caucasian and American, Tsai is Asian and Taiwanese, and Coyner is Caucasian and American.  (Li Dep. 78-79).

had been eliminated in the RIF. LJFFSE selected I-Chun Tsai to recall, which left Brandi Noll, Nasser Razek, and Plaintiff as the three faculty directly affected by the RIF action. (Li Dep. 77-78).

### D.  UA's Rationale for Selecting Plaintiff's Position for the RIF

Dr. Tudor completed a "Position Abolishment Rationale" form for each position to be eliminated, including Plaintiff's, in which he memorialized the basis for his recommendations. (Li Dep. 116; Ex. L). As with all positions abolished, Dr. Tudor listed "Reasons of Economy" as the rationale and he explained: [4]

> On June 8, the university administration issued an operating budget for the LeBron James Family Foundation College of Education ("LJFFCOE"). As a result of the reduced budget for the LJFFCOE, the LJFFCOE is unable to maintain the current staffing levels and, for reasons of economy, this position is being abolished. ***It is also the case that the academic program associated with this position has been eliminated***. The amount of savings pursuant to the elimination of this position is $129,808.83 which is inclusive of salary and benefits associated with this position.

*Id.* (emphasis added). Dr. Tudor also noted that the remaining faculty could teach all existing sections/classes being taught by Plaintiff. *Id.*

Dr. Tudor selected Plaintiff's position for elimination for three reasons. (Tudor Dec. ¶8). First, the academic program of which it had been a part had been eliminated. (Tudor Dec. ¶9; Tudor Dep. 19; Lenhart Dep. 20; Ex. L, "This faculty member is no longer associated with an academic program;" Ex 3, ¶14). Plaintiff had been hired into a department (EFL) that no longer existed, and she had been affiliated with a departmental program, "Educational Foundations," that no longer existed. (Tudor Dep. 20; Lenhart Dep. 20). Plaintiff's field of expertise, "Special

---

[4] The reasons a state entity may utilize job abolishments are limited to three by statute: a reorganization for the efficient operation of the appointing authority, reasons of economy, or for lack of work. O.R.C. §124.321(D). An affected employee must be provided with a "notice of abolishment," and Plaintiff was. (Ex. L).

Foundations of Education," had ceased to operate as a distinct programmatic area within LJFFSE. (Tudor Dep. 32).

Second, Plaintiff's position carried a higher salary in comparison to the remaining faculty in LJFFSE. (Tudor Dec. ¶10; Ex. L, "This faculty member carries a high salary in comparison to other faculty in the same department;" Ex. 3, ¶16; Lenhart Dep. 36-37). Plaintiff's had the fifth-highest salary out of approximately 20 to 22 faculty members. (Tudor Dec. ¶10; Li Dep. 122-23).

Third, Plaintiff had limited teaching versatility -- she taught foundational courses that could be readily staffed with the remaining LJFFSE faculty. (Tudor Dec. ¶11; Ex. 3, ¶17-18; Lenhart Dep. 37-38). Dr. Tudor explained that LJFFSE housed several different "programs" after the merger of EFL and CIS and the transition of LJFFSE from a College to a "School" within BCAS. These extant programs included "early childhood education," "special education," "middle level" (4-9 license), and "Adolescent to Young Adult ("AYA")" (7-12 license). (Tudor Dep. 17-20). Plaintiff had never been involved in these four remaining programs - if Tudor were to meet with the faculty of these programs, for example, Plaintiff was not an invitee or attendee at those meetings. (Tudor Dep. 19-20). "[Plaintiff] was hired in as a member of a department that no longer existed and a program that no longer existed which was Educational Foundations." (Tudor Dep. 20).

Dr. Lenhart confirmed this point. (Lenhart Dep. 20; Ex. 3, ¶15). Plaintiff's position only "supported programs" with which she was not affiliated or directly involved. (Lenhart Dep. 20). "The abolishment of this position made sense through both a financial and programmatic lens." (Ex. 3, ¶15). As discussed above, the Department historically struggled to find Plaintiff teaching load. This, combined with Plaintiff's high salary and lack of program, made her position ripe for inclusion in the RIF. (Tudor Dec. ¶¶8-11).

On July 15, 2020, UA's Board of Trustees passed Resolution 7-7-20, eliminating 96 faculty positions, including the six positions in LJFFSE.  (Li Dep. 73-74; Ex. F).[5]  UA issued a letter to Plaintiff on July 17, 2020, notifying her of the elimination of her position effective August 21, 2020.  (Li Dep. 114-16; Ex. K).  Plaintiff never spoke with Dr. Tudor or Dr. Lenhart about why her position was included in the RIF.  (Li Dep. 82).  Nor did she ever speak with Joe Urgo (Interim Dean of BCAS), Provost John Wiencek, President Gary Miller, or anyone in UA's equal employment opportunity office regarding her RIF.  (Li Dep. 109-10, 115).

After her separation, UA offered Plaintiff teaching opportunities on a part-time, adjunct faculty basis. (Li Dep. 39-40).  Plaintiff has taught in four separate semesters since the RIF.  *Id.* UA was, and continues to be, contractually required to offer Plaintiff these part-time positions, on an adjunct faculty basis, based on the Article 15 of the CBA UA holds with Akron-AAUP.

III.  **Law & Argument**.

A.  **Plaintiff Cannot Establish the Fourth Prong of her *prima facie* Case.**

Title VII race and national origin discrimination claims utilize the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  To establish  a *prima facie* discrimination case, a plaintiff must show she was: (1) a member of a protected class; (2) subject

---

[5] Plaintiff was a member of the AAUP for the entire time it was certified as the exclusive representative of the faculty bargaining unit.  (Li Dep. 59-60). As discussed in greater detail below, Article 15 of the CBA, titled *Retrenchment*, contains the procedure to be used to implement a reduction of faculty positions and includes a catastrophic circumstance (*i.e.* "force majeure") narrow exception to effectuate a RIF.  In effectuating the elimination of 96 bargaining-unit faculty positions in July 2020, UA invoked this narrow exception in Article 15 based on catastrophic circumstances created by the COVID-19 pandemic.  AAUP grieved the decision.  (Ex. H).  On September 18, 2020, Arbitrator Jack Buettner rendered a final and binding decision on the issue, holding the University exercised its prerogative appropriately under the narrow exception in Article 15 and implemented the July 15, 2020 RIF correctly under the CBA. (Ex. I). Consequently, the 96 Akron-AAUP faculty positions abolished by the RIF (including the position held by Plaintiff) remain undisturbed as Arbitrator Buettner held the action taken did not violate the CBA.  *Id.*

to an adverse employment action; (3) qualified for the position; and (4) replaced by a person outside the protected class or treated differently than similarly situated male employees. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016).

When a RIF is involved, however, the fourth prong of the *prima facie* case includes a heightened burden for a plaintiff to "present additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled [her] out … for impermissible reasons." *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1465 (6th Cir.), *cert. denied*, 498 U.S. 878 (1990); *see also Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018) (applying heightened burden in Title VII case). According to *Barnes*, such additional evidence is required because "when work force reductions by the employer are a factor in the decision, the most common legitimate reasons for the discharge are the work force reductions." *Barnes*, 896 F.2d at 1465. "The guiding principle [in a RIF case] is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of [her protected class]." *Barnes,* 896 F.2d at 1466.

UA does not dispute that Plaintiff meets the first three elements of a *prima facie* case.[6] However, Plaintiff cannot establish the fourth prong. Indeed, based on the record, it is not entirely clear how Plaintiff intends on establishing this element. She did not retain an expert to conduct any statistical analyses. Further, she admitted she has no evidence of statements that reveal a discriminatory motive. (Li Dep. 28-32). Plaintiff concedes Dr. Tudor never made any comments that she found offensive on the basis of her national origin and/or race. (Li Dep. 28). Nor did anyone else at UA make such comments. (Li Dep. 28-29). No one made any ethnic slurs in her

---

[6] With respect to the first element, Li identified her race as Asian, and her national origin as Taiwanese. (Li Dep. 15-16).

presence.  (Li Dep. 32).  No one in UA leadership made any reference to Plaintiff being separated in the RIF because of her race or national origin.  *Id.*

Given that the Sixth Circuit has held a *prima facie* case of discrimination in the RIF context cannot be established based on the fact that all eliminated employees were of a particular protected class (which is not even the case here as half of the six RIF'ed faculty were Caucasian/American), any attempt by Plaintiff to argue that the simple number of Asians v. Non-Asians selected for the RIF will not meet the required evidentiary threshold as a matter of law.  *See Slapak v. Tiger Management Group, LLC*, 594 Fed. Appx. 290, 295 (6th Cir. 2014) ("This composition is simply not enough, standing alone, to indicate that it is a result of illegal discrimination.").  Moreover, in a similar case alleging race and age discrimination, a plaintiff attempted to establish her fourth RIF prong by pointing to her department separating three African American employees all over the age of 40; however, the Court quickly discarded this argument. *Heyward v. CDM Smith, Inc.*, 2015 U.S. Dist. LEXIS 103314, *9 (E.D. Tenn. Aug. 5, 2015).  It explained that: "[a]part from the limited value of such a small sample size, narrowly focusing on the procurement department ignores the fact that the RIF was ongoing and company-wide." *Id.  Slapak* and *Heyward* make it clear that pointing to other impacted employees on a departmental level is insufficient to establish the fourth RIF prong, particularly where the RIF is company-wide, or in this case campus-wide. Plaintiff fails to allege any background circumstances necessary to meet the heightened test for discrimination in the RIF context.

Further, if UA actually had discriminatory animus toward Asian/Taiwanese individuals, it had an odd way of showing it.  When the opportunity to recall a faculty member due to a resignation within the School of Education arose, the University recalled Tsai, who, just like

11

Plaintiff, is Asian and Taiwanese. Based on its actions, UA demonstrated quite clearly it holds no discriminatory animus based on national origin, race, or any other protected classification.

### B.   Plaintiff Cannot Demonstrate That UA's Legitimate Non-Discriminatory Reasons for her RIF are Pretextual.

Assuming *arguendo* the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Burdine*, 450 U.S. at 254-56.  If the defendant satisfies its burden, the plaintiff must then show not only that the defendant's articulated reason was a pretext, but that the real reason was unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). The ultimate burden of persuasion remains throughout this analysis on Plaintiff. *Burdine*, 450 U.S. at 253.

UA clearly had legitimate non-discriminatory reasons for its decision. Plaintiff presumably is not questioning the foundation for UA's invocation of CBA Article 15 Section 12 RIF and consequential elimination of 96 faculty positions due to the financially catastrophic circumstances occasioned by COVID-19. Given Plaintiff is a bargaining unit member bound by Arbitrator Buettner's decision (Ex. G: Art. 12§7(C); Li Ex. I, Li Dep. 102, 110) that the RIF action complied with the CBA's *force majeure* provision in Article 15, Section 12 (i.e., that catastrophic financial circumstances existed that warranted the RIF) (Ex. I), UA has more-than met its burden on this point. *See Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 662 (6th Cir. 1999) (finding that the employer had a legitimate, non-discriminatory reason for the termination as part of a RIF when the plaintiff presented no evidence that the RIF was not *bona fide*).  An independent Arbitrator has already decided that UA correctly relied on the CBA to abolish the faculty positions. In meeting this element, Plaintiff must produce some evidence "to rebut the presumption that the reduction in the workforce is the legitimate reason for her termination." *Jones v. Fluor Fernald, Inc.*, 216 Fed. Appx. 461, 462-63 (6th Cir. 2006) (finding nothing in the record to tie the plaintiff's termination

in a RIF to either her race or her complaints about safety and equal pay concerns).  Plaintiff cannot meet this burden.

As discussed above, Dr. Tudor selected Plaintiff for inclusion in the RIF for three reasons: (1) she was no longer affiliated with an academic program; (2) she had one of the highest salaries in LJFFSE; and, (3) she had limited teaching versatility -- she taught foundational courses that could be readily staffed with the remaining LJFFSE faculty.  Plaintiff has no evidence indicating that UA singled her out based on her race or national origin, as opposed to these three reasons.

To demonstrate UA's proffered reason for her discharge was pretextual, Plaintiff must "show by a preponderance of the evidence either (1) that the proffered reason had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate her discharge, or (3) that they were *insufficient* to motivate discharge." *Manzer v. Diamond Shamrock Chems., Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). "It is not enough … to disbelieve the employer; the factfinder must believe the plaintiff's explanation of <u>intentional</u> discrimination." *Lucent Technologies*, 226 Fed. Appx. at 591, *Technologies, Inc.*, 226 Fed. Appx. 587, 591 (6th Cir. 2007) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)).  In meeting this element, Plaintiff must produce some evidence "to rebut the presumption that the reduction in the workforce is the legitimate reason for her termination." *Jones*, 216 Fed. Appx. at 462-63.  Plaintiff cannot overcome this additional hurdle.[7]

---

[7] Plaintiff has filed any number of actions in any number of forums with no success.  Plaintiff was covered by the AAUP's grievance challenging UA's RIF decision, which led to Arbitrator Buettner's Award upholding UA's economic rationale for invoking "force majeure."  (Exs. H, I).  Plaintiff was also a named Grievant in AAUP Grievance 2020-03, which challenged the RIF on grounds that, *inter alia*, it was discriminatory on protected class bases. (Li Dep. 111; Ex. J). The AAUP declined to take Li's grievance to binding arbitration, although it took two other professors' cases. (Li Dep. 112-13).  Plaintiff also contended that her exercise of rights to file *grievances* under the CBA was the true motivation for her inclusion in the RIF.  (Li Dep. 185).  Plaintiff sought an administrative remedy by filing unfair labor practices at the State Employment Relations Board, alleging that her *grievance activities* were the true reason for her separation

It is unclear how Plaintiff might attempt to show pretext.  Plaintiff cannot simply rely on her own opinion or on her national origin/race alone to meet her burden on pretext.  *See, e.g., EEOC v. Lucent Technologies, Inc.*, 226 Fed. Appx. 587, 591 (6th Cir. 2007) ("The mere fact that [plaintiff] was African-American is not enough to establish that he was someone targeted for termination… [the plaintiff] certainly cannot be arguing that [his] race alone somehow permanently insulated him from ever being terminated…").

Plaintiff herself has admitted, "The RIF is quite diverse." (Li Dep. 229-31; Ex. LL). Further, Plaintiff contemporaneously (on July 17, 2020) admitted one of Tudor's reasons for her RIF:  i.e., she does not have a strong case for wrongful termination "because I do not have a program." (Li Dep. 189-90; Ex. AA).  Plaintiff has apparently now changed her mind and decided she *did* have a program at the time of the RIF because UA does "not even offer an official definition of 'program.'"  (Li Dep. 190).  When pressed, she could not identify what that program was. (Li Dep. 191-92).  Instead, Plaintiff only identified the courses she taught, and that those courses were part of the curriculum in other programs.  It appears her contention is that since she taught the Introduction to Education course, which is a required course for all education majors, she necessarily is a part of every conceivable program in the School of Education.  (*See, e.g.,* Tudor Dep. 19:  Question: "So even though she taught foundational courses which were necessary in virtually all, if not all, the programs, she becomes not a part of any program?")  But, as Tudor and Lenhart testified, this is simply untrue and not reflective of how the School actually operates.

---

from UA.  SERB rejected her allegations.  (Exs. V, W, X, Y, Z).  Plaintiff filed a Charge of Discrimination with the Ohio Civil Rights Commission alleging multiple forms of discrimination and retaliation.  (Ex. R). The OCRC found "no probable cause."  (Ex. S).  The Equal Employment Opportunity conducted a review of the OCRC's determination and upheld its disposition. (Exs. T, U).

Any argument by Plaintiff that other LJFFSE faculty could not teach the introductory course she taught has no basis in fact.  Although Plaintiff contended her remaining colleagues were not qualified to teach the introductory course that she taught, she also conceded that all remaining LJFFSE faculty met the minimum requirement to teach the introductory course (i.e., a master's degree in the training area). (Li Dep. 205, 209).  Dr. Tudor explained this point noting that "anybody" in the School was "qualified to teach it."  (Tudor Dep. 30).  Indeed, numerous faculty (including adjunct professors) taught Introduction to Education concurrent with Plaintiff prior to the RIF.  (Tudor Dep. 31, 44).   Dr. Tudor also confirmed that, for accreditation purposes, no minimum requirements for teaching the course existed, but at a baseline, anyone teaching a bachelor's level course must have a master's degree.  (Tudor Dep. 42).   "The best people to teach Intro to Education are those that are actually teaching early childhood, middle childhood, AYA, special ed, because they're the ones that are bringing those students along from start to finish. They're the ones who have the best training for it." (Tudor Dep. 43).  Hence, not only are the remaining faculty qualified, they arguably hold better qualifications to teach the introductory course than Plaintiff.

Dr. Lenhart was more direct: "we can all teach that course." (Lenhart Dep. 14).  "[A]nyone in the field of education could teach Introduction to Education." (Lenhart Dep. 14-15). As for the graduate course previously taught by Plaintiff, (i.e., "Philosophy of Education") "[n]ot everyone needed that class. So it's not offered in all of our programs like some other courses everyone must take. * * * [O]nly one of our Master's degree[s] requires students to have that course, and there were only a few students in it." (Lenhart Dep. 14).

As to Plaintiff's second ostensible argument, she identified four "higher paid" personnel as would-be comparators -- Coyner, Welton, Lenhart, and Susi Kushner Benson. (Li Dep. 123).

This argument actually bolsters UA's position.  Coyner and Welton, who both earned more than Plaintiff, were *included in the RIF* but chose to retire.  Hence, UA achieved the savings associated with their positions.  Dr. Lenhart, a tenured faculty member, had been with UA since 1998 (Ex. 3, ¶1) and maintained a substantial teaching load.  (Tudor Dec. ¶10).  However, Dr. Lenhart held an administrative position at the time of the RIF, as a Department Chair.  (Lenhart Dep. 6).  Dr. Tudor did not include Dr. Lenhart in the RIF because JFFFSE needed to maintain continuity in leadership.  (Tudor Dec. ¶10).  Dr. Tudor did not include Benson in the RIF because she maintained a unique position that was crucial to the relationship LJFFSE maintained with the LeBron James Family Foundation.  Further, she had a diverse teaching background with a specialization on special education. (Tudor Dec. ¶10).

Plaintiff seems to be misconstruing UA's rationale for including her position in the layoff: it was not that Plaintiff had *the highest* salary, but *one of the highest* salaries.  UA did not base its decisions about faculty layoffs exclusively on salaries; that UA retained other faculty with a "high salary" is not enough to satisfy the "background circumstances" for a *prima facie* case of discrimination, nor is it enough to demonstrate pretext.

## IV.  <u>Conclusion</u>.

The University of Akron, on July 15, 2020, eliminated 178 positions campus-wide.  The reduction in force was conducted on a massive scale, impacting hundreds of employees.  Plaintiff was <u>not</u> singled out based on her race and/or national origin. She taught only two courses historically, one of which could be covered by any other faculty member in the School and the other course related to one Master's program with limited student enrollment.  Further, Plaintiff held one of the highest salaried positions in the School and had no teaching versatility based on her narrow specialization area. UA clearly had a legitimate non-discriminatory reason for the RIF

16

as a whole and to RIF the position held by Plaintiff.  Dr. Li cannot produce any evidence to establish the fourth prong of her *prima facie* case or to otherwise mount an attack on UA's legitimate business reasons.

For the foregoing reasons, no dispute of material fact exists and grant of Defendant's summary judgment motion is fully supported as a matter of law on Plaintiff's Title VII claim of race/national origin discrimination.  Accordingly, Defendant requests that the Court grant summary judgment in its favor.

Respectfully submitted,

DAVE YOST (0056290)
Attorney General of Ohio

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)
Sarah J. Moore (0065381)
ZASHIN & RICH CO., L.P.A.
950 Main Avenue, 4th Floor
Cleveland, OH 44113
Telephone: (216) 696-4441
Facsimile: (216) 696-1618
dcp@zrlaw.com
sjm@zrlaw.com

*Attorneys for Defendant University of Akron*

## CERTIFICATE OF SERVICE

This will certify that the foregoing was filed electronically on January 27, 2023.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)

17