# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| HUEYLI LI, | ) | CASE NO. 5:21-cv-2277 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| UNIVERSITY OF AKRON, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is defendant's motion for summary judgment. (Doc. No. 27 (Motion).) Plaintiff opposes the motion (Doc. No. 34 (Opposition)), and defendant has replied. (Doc. No. 35 (Reply).) For the reasons set forth herein, defendant's summary judgment motion is granted and this case is dismissed.

## I.  BACKGROUND

Plaintiff Hueyli Li ("plaintiff" or "Dr. Li") brings this civil rights action against her former employer, defendant University of Akron ("defendant" or "UA"), challenging her termination in 2020 as part of a campus-wide reduction-in-force ("RIF"). Dr. Li was born in Kaohsiung, Taiwan in 1956. (Doc. No. 26-1 (Deposition of Hueyli Li), at 16.[1]) Dr. Li identifies her race as Asian and her national origin as Taiwanese. (*Id*. at 17.) She earned her bachelor's degree in Taiwan and taught high school there for several years before she immigrated to the United States in 1983. (*Id*. at 34–

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

35.) While living in the United States, Dr. Li earned master's degrees in educational psychology and educational philosophy and a doctoral degree in social foundations of education. (*Id*. at 35–36.) Given her educational background, Dr. Li's specialization is social and philosophical foundations of education. (*Id*. at 36–37, 142; Doc. No. 24-1 (Deposition of Jarrod Tudor), at 22–23.)

She began working for UA as an Assistant Professor of Educational Foundations in the fall of 1995. (Doc. No. 26-1, at 38; *id*., Ex. A (March 23, 1995 Offer Letter).) In 2014, the academic program entitled Educational Foundations – Social/Philosophical Foundations of Education was eliminated by UA's Board of Trustees ("UA's Board").[2] (Doc. No. 27-1 (Declaration of Jarrod Tudor, Ph.D.) ¶ 9; *id*., Ex. A (Resolution), at 7; *see* Doc. No. 24-1, at 20–21.) Dr. Li obtained tenure in 2000, along with a promotion to the rank of Associate Professor. (Doc. No. 26-1, at 38.) She was further promoted to the position of full Professor in 2005. (*Id*.) Dr. Li's position was covered by a collective bargaining agreement ("CBA") between UA and the American Association of University Professors ("AAUP"). (*See id.*, Ex. G (CBA).)

Though she was one of several faculty members who taught social and philosophical education courses, even after Educational Foundations – Social/Philosophical Foundations of Education was eliminated, there is no dispute that there were only two courses Dr. Li consistently taught each semester she was with UA. The first class, "Introduction to Education," was a 200-level undergraduate course required for all students interested in any teaching major. The second

---

[2] As will be discussed more fully below, the use of the word "program" as it relates to the reasons for Dr. Li's inclusion in the RIF is disputed by the parties. The Court uses the term "academic program" here because that was the term used by UA's Board in its 2014 resolution. (Doc. No. 27-1 ¶ 9, Ex. A, at 7.) Whether it is considered an academic program, a course of study, a major, or an area of concentration, Dr. Li does not specifically deny UA's Board's actions on February 5, 2014, and thereafter with respect to Educational Foundations – Social/Philosophical Foundations of Education.

class, "Philosophy of Education," was a 600-level graduate course that was only required for one master's program offered at UA. (Doc. No. 25-1 (Deposition of Lisa Lenhart), at 15–16; Doc. No. 26-1, at 50, 52–55; Doc. No. 27-1 ¶ 12.)

During the course of her employment with UA, Dr. Li was a faculty member of the Lebron James Family Foundation School of Education ("LJFFSE"). (Doc. No. 26-1, at 58; Doc. No. 27-1 ¶ 4; *see id*. ¶ 2.) Dr. Li was affiliated with the Department of Educational Foundations and Leadership ("EFL"), one of several departments within LJFFSE. (Doc. No. 27-1 ¶¶ 3, 10.) By 2019, LJFFSE was scaled back to just two departments: EFL and Curricular and Instructional Studies ("CIS"). (Doc. No. 25-1, at 7–8, 30; Doc. No. 27-1 ¶ 10.) Although EFL remained a separate department from CIS, EFL faculty members taught courses in the curriculum for CIS' degree programs. (Doc. No. 24-1, at 41.) On September 28, 2018, the LJFFSE faculty voted to combine the EFL and CIS departments. (Doc. No. 27-1 ¶ 10; *id*., Ex. B (College Council Agenda—College of Education).)

In early 2020, due in part to the COVID-19 pandemic, UA forecasted a $65 million structural budget deficit for the 2021 fiscal year. (Doc. No. 26-1, at 66–67; Doc. No. 27-1 ¶¶ 3, 5.) In response, on July 15, 2020, UA's Board approved a number of cost-savings resolutions. (Doc. No. 27-1 ¶ 5 (1)–(8).) With respect to personnel, UA's Board voted to eliminate 82 non-bargaining unit positions campus-wide and 96 AAUP bargaining unit positions campus-wide. (*Id*. ¶ 5(7), (8).) The 96 union positions were eliminated pursuant to Article 15 of the CBA entitled "Retrenchment," which provided for the reduction of bargaining unit faculty positions due to,

among other events, a "[f]inancial exigency[.]"[3] (*See* Doc. No. 26-1, Ex. G, at 390.) Ultimately, Dr. Li's position was one of the bargaining unit positions that was eliminated.

Following UA's Board's resolutions, in Spring 2020, UA Provost John Wiencek directed all academic units, including LJFFSE, to examine their operating budgets and recommend a revised budget for fiscal year 2021 that would result in an approximate 25% budget reduction over the previous fiscal year. (Doc. No. 24-1, at 11–12.) At the time this directive was issued, the Interim Dean of LJFFSE was Jarrod Tudor, who served in that role from July 2017 to July 2020. (Doc. No. 24-1, at 7–8; Doc. No. 27-1 ¶ 3.) Dean Tudor was tasked with the responsibility of recommending to the provost positions in LJFFSE for elimination, though he would "bounce ideas" off of Dr. Lisa Lenhart, who at the time of the RIF was the departmental chairs of EFL and CIS. (Doc. No. 24-1, at 10; Doc. No. 25-1, at 11, 13, 21.) Dean Tudor ultimately recommended to Provost Wiencek the elimination of six positions in the LJFFSE, including Dr. Li's position. (Doc. No. 24-1, at 9–10, 37; Doc. No. 27-1 ¶¶ 7–8.) The provost approved the list of proposed terminations *in toto* after Dean Tudor left UA to pursue another employment opportunity. (Doc. No. 24-1, at 8–10; *see* Doc. No. 27-1 ¶ 2.)

Dean Tudor took a "wholistic" approach to deciding which positions within LJFFSE would be recommended for elimination to reduce the budget by the targeted 25% mark. (Doc. No. 25-1, at 37.) Specifically, he avers that he reviewed the qualifications of all faculty members of the

---

[3] AAUP grieved UA's invocation of Article 15 as the basis for the RIF. (Doc. No. 26-1, Ex. H (AAUP Grievance).) On September 18, 2020, the arbitrator issued a final and binding decision finding that UA properly implemented Article 15 when it abolished the 96 bargaining unit member positions. (*Id.*, Ex. I (Arbitrator Decision and Award), at 531.) The decision made no determination as to whether the inclusion of any particular bargaining unit member in the RIF was lawful. Dr. Li correctly argues that the arbitrator's decision does not foreclose the federal discrimination claim she brings in this case, and the Court does not understand UA to be advancing such a position. (*See* Doc. No. 34, at 19; Doc. No. 35, at 13.)

4

LJFFSE and the departments and programs to which they were affiliated. In this analysis, he also reviewed each employee's compensation to establish which positions could be eliminated and account for the greatest cost savings. (Doc. No. 27-1 ¶ 10.) While he knew that faculty positions would need to be cut, Dean Tudor testified that the goal was to preserve as many faculty positions as possible. Because Dr. Lenhart's chief responsibility as department chair was scheduling, Dean Tudor ran potential personnel cuts by her to make sure that it would still be possible to put together a full schedule with remaining staff. (Doc. No. 24-1, at 36, *see id*. at 42; Doc. No. 25-1, at 13, 34.) For example, Dean Tudor initially considered eliminating all non-tenure track positions. (Doc. No. 25-1, at 35.) After consulting with Dr. Lenhart, Dean Tudor rejected this option because it would have "wiped out" LJFFSE's entire literacy program. (*Id*.)

The six positions Dean Tudor ultimately settled on for possible elimination were held by Drs. Nasser Razek, Brandi Noll, Evonn Welton, I-Chun Tsai, Sandra Coyner, and Dr. Li. (Doc. No. 24-1, at 28–31; Doc. No. 26-1, at 77; *see* Doc. No. 27-1 ¶¶ 7–8.) Drs. Noll, Coyner, and Welton are white and their country of origin is the United States. (Doc. No. 26-1, at 80–81.) Dr. Razek is Egyptian (*id*. at 80), and Dr. Tsai is Asian. (*Id*. at 81.) Drs. Coyner and Welton elected to retire when their positions were eliminated. (*Id*. at 79.) And when Kristen Koskey, a LJFFSE faculty member unaffected by the RIF resigned, Dr. Tsai was recalled to her position. (*Id*.; *id*., Ex. P (Letter of Recall), at 557.)

Dean Tudor completed a Position Abolishment Rationale ("PAR") for each position he recommended for elimination. With respect to the PAR associated with Dr. Li's position, the PAR provided:

> On June 8[, 2020], the university administration issued an operating budget for the LeBron James Family Foundation College of Education[]. As a result of the

5

> reduced budget for the [LJFFSE], the [LJFFSE] is unable to maintain the current staffing levels and, for reasons of economy, this position is being abolished. It is also the case that the academic program associated with this position has been eliminated. The amount of savings pursuant to the elimination of this position is $129,808.83, which is inclusive of salary and benefits associated with this position.

(Doc. No. 26-1, Ex. L (Position Abolishment Rationale), at 546.) The PAR further provided that "[t]here exists sufficient bargaining unit faculty to teach the existing sections." (*Id*.) In response to a printed question relating to why other faulty members in the same department were not selected for termination, the PAR provided that "[t]his faculty member is no longer associated with an academic program." (*Id*. at 547.) Under the heading of "Any Other Considerations Used to Decide[,]" the PAR stated that "[t]his faculty member carries a high salary in comparison to other faculty in the same department." (*Id*.)

In his declaration, Dean Tudor identified three reasons why he recommended Dr. Li's position for elimination. First, consistent with the PAR, he noted that Dr. Li "was no longer affiliated with an academic program[.]" (Doc. No. 27-1 ¶ 8.) Second, he averred that "she had one of the highest salaries in LJFFSE" (*id*.; *see id*. ¶ 11 ("Dr. Li had the fifth highest salary" in LJFFSE)), and, third, that "she had limited teaching versatility—she taught foundational courses that could be readily staffed with the remaining LJFFSE faculty." (*Id*. ¶ 8.) Dr. Li's last day of employment with UA as a full-time professor was August 21, 2020. (Doc. No. 26-1, Ex. K (Letter of Termination).)

On October 21, 2020, Dr. Li filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC"), in which Dr. Li claimed that her termination was the result of, among other things, race and national origin discrimination. (Doc. No. 26-1, Ex. R (OCRC Charge), at 562.) On June 24, 2021, the OCRC issued a no probable cause determination and dismissed her

charge. (*Id.*, Ex. S (Letter of Determination), at 591.) Dr. Li filed the present federal action on December 3, 2021. In her complaint, plaintiff raises a solitary claim of national origin and/or race discrimination in violation of 42 U.S.C. § 2000e *et seq.* (*See* Doc. No. 1 (Complaint).)  Defendant seeks summary judgment, pursuant to Fed. R. Civ. P. 56, in its favor on this claim.

## II.    SUMMARY JUDGMENT

### A.    Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). In most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (finding that summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003). Under this standard, "the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment [motion]." *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (quotation marks and emphasis omitted) (citing *Anderson*, 477 U.S. at 247–48).

### B.  Evidence on Summary Judgment and Sham Affidavits

A party seeking or opposing summary judgment may rely on "deposition transcripts, electronically stored documents, affidavits, declarations, and other materials." *Beans v. City of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *6 (N.D. Ohio Dec. 30, 2016) (citing Fed. R.

Civ. P. 56(c)(1)(A)). Rule 56(c)(4) requires that affidavits or declarations "used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 (requiring introduction of sufficient evidence to support a finding that the witness has personal knowledge of a matter). Thus, statements contained in affidavits that are "nothing more than rumors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584–85 (6th Cir. 1992) (citations omitted). Legal arguments and conclusion set forth in affidavits are likewise inadmissible. *See Harrah's Ent., Inc. v. Ace Am. Ins. Co.*, 100 F. App'x 387, 394 (6th Cir. 2004) ("It is well settled that courts should disregard conclusions of law (or ultimate fact) found in affidavits submitted for summary judgment." (quotation marks and citation omitted)).

Additionally, it is well settled that a party may not contradict earlier deposition testimony by subsequently offering an inconsistent affidavit. *See Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 789 (6th Cir. 2002) (citing, among authority, *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997)). Absent a "persuasive justification for the contradiction[,]" a directly contradictory affidavit should be disregarded. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). However, even an affidavit without a direct contradiction may be disregarded if the Court determines the affidavit "'constitutes an attempt to create a sham fact issue.'" *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)); *but see Baer v. Chase*, 392 F.3d 609, 625 (3d Cir. 2004) (noting a so-called "sham" affidavit need not be disregarded if there is "independent evidence in the record to bolster [the] otherwise questionable affidavit"). To

determine whether a party attempted to create a sham issue of material fact, the Sixth Circuit has approved the list of non-exhaustive factors outlined in *Franks, supra. See Aerel, S.R.L.*, 448 F.3d at 909–10. Relevant factors include: (1) whether the affiant was cross-examined during her earlier testimony; (2) the affiant's access to the pertinent evidence at the time of her earlier testimony; (3) whether the affidavit was based on newly discovered evidence; and (4) whether the earlier testimony reflects confusion, which the affidavit attempts to explain. *Franks*, 796 F.2d at 1237.

On January 6, 2023, Dr. Li sat for her deposition, at which time she was cross-examined extensively on her employment history, her academic qualifications, her teaching workloads, the history of LJFFSE, her termination from UA, as well as her allegations of discrimination contained in the complaint. (*See generally* Doc. No. 26-1.) In her brief in opposition to summary judgment, Dr. Li now relies extensively on a declaration she prepared more than two months after her deposition. (*See* Doc. No. 34 (Declaration of Hueyli Li), at 23–29.) In her six page, singled-spaced declaration, she retreads many of the issues addressed during her deposition, devoting multiple pages to reproducing—and at times diverging from—her sworn deposition testimony. Her declaration also offers additional facts that were available to Dr. Li at the time she was deposed. UA argues that her declaration represents a sham affidavit, and this Court agrees.

For example, in paragraph two of the declaration, Dr. Li attempts to augment her attack upon Dean Tudor's stated reasons for including her in the RIF by adding to her teaching responsibilities duties well beyond those she identified in her deposition. (*Compare* Doc. No. 26-1, at 85, 144–46, 157 *with* Doc. No. 34, Declaration ¶ 2, at 23–25.) These facts relating to her own professional responsibilities were clearly known to Dr. Li at the time she was deposed. Dr. Li expressed no confusion or failure to recall details during her deposition, and it is inappropriate for

her to attempt to introduce into the record facts that cannot be tested on cross-examination.

Even more problematic is the fact that the declaration is laced with argument comingled with personal opinion. Again, in paragraph two of her declaration, she unabashedly prefaces her attack of Dean Tudor's stated reasons for discharge by stating, "Listed below is my refutation of the defendant's factually inaccurate and self-contradictory claims included in Dr. Tudor's Deposition and Declaration[.]" (Doc. No. 34, Declaration ¶ 2, at 24.) Elsewhere she attempts to advance pure arguments disguised as factual assertions. (*See, e.g. id*. ¶ 2(a), at 24 (arguing UA "didn't apply this false rationale [that a program had been eliminated] to abolish the faculty positions held by Drs. Kushner Benson and Koskey whose graduate programs were eliminated in 2018"); *id*. ¶ 2(c), at 25 (arguing that UA did not identify the rationale of "limited versatility" in her PAR, and insisting that "teaching versatility was my strength rather than weakness"); *id*. ¶ 3 (arguing "[a]lthough 5100: 200 [Introduction to Education] is a lower-division course, the course content is essential for cultivating teacher candidates' commitment to democratic education"); *id*. ¶ 4, at 26 (arguing UA did not support its opposition to plaintiff's OCRC charge with evidence).) Indeed, Dr. Li is clear that she is advancing these arguments to bolster and support her opinion that UA did not properly evaluate her worth to the institution when it eliminated her position. (*See id.* ¶ 4, at 27 ("Again, it is my firm belief that I am as valuable as my non-RIF colleagues at the UA.").)

Dr. Li also offers "anecdotes" that she believes "could facilitate a contextual understanding of the campus climate[,]" but she identifies no facts from which the Court can find that she has personal knowledge of these events. (*Id*. ¶ 5, at 27–28.) Specifically, she discusses at length the employment history of several former professors and deans of color, and their purported

discriminatory treatment by UA. (*Id.*) With the possible exception of the appointment of Dean Tudor, which Dr. Li represents was the subject of a grievance filed by Dr. Li and several of her colleagues, Dr. Li is simply not competent to testify as to these matters. (*See id.* ¶ 5, at 28.)

"When a so-called 'affidavit' strays from admissible facts, the Sixth Circuit has held that a trial court has discretion to strike the affidavit in whole or in part, depending upon the ease with which it can 'distinguish between knowledge and belief for each of the affidavit's averments.'" *El Bey v. Kehr*, No. 1:19-cv-693, 2023 WL 2018769, at *5 (S.D. Ohio Feb. 15, 2023) (quoting *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015)). Given the inherent difficulty in separating out possible admissible facts from impermissible argument, conjecture, hearsay, conclusory opinions, and contradictory or improperly augmented testimony, the Court hereby disregards the declaration. *See, e.g., id.* (finding that "[h]ere, the burden of trying to ferret out statements of fact from argument would be extraordinary" (collecting cases)).

### III.    DISCUSSION

In its summary judgment motion, UA contends that Dr. Li has failed to make out a *prima facie* case of race and/or national origin discrimination under federal law. Specifically, it argues that Dr. Li has not established that she was singled out for disparate treatment on the basis of her race or national origin. UA maintains that Dr. Li's statistical evidence falls short, as a matter of law, of satisfying the requirement that she come forward with additional evidence tending to indicate that her inclusion in the campus-wide RIF was motivated by impermissible reasons. And, in any event, UA insists that Dr. Li has not demonstrated that she can carry her burden of proving that its proffered reasons for eliminating her position in the RIF were mere pretext for unlawful discrimination.

### A. *McDonnell Douglas*' Burden-Shifting Framework

Title VII makes it an unlawful employment practice to "fail or refuse to hire or to discharge" an individual because of that person's race or national origin. 42 U.S.C. § 2000e-2(a)(1). Where, as here, there is no direct evidence of discrimination based on any of the protected characteristics, courts apply the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). A plaintiff must first establish the elements of a *prima facie* case. She must show:

> 1) [S]he is a member of a protected class; 2) [s]he was qualified for the job and performed it satisfactorily; 3) despite h[er] qualifications and performance, [s]he suffered an adverse employment action; and 4) [s]he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside of h[er] protected class.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014).

"When a plaintiff's position is eliminated due to a reduction in force (RIF),[4] the fourth prong is met by presenting additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Stipkala v. Am. Red Cross*, 215 F.3d 1327 (Table), 2000 WL 712378, at *4 (6th Cir. May 23, 2000) (per curiam) (quotation marks omitted). The duty to present a *prima facie* case is somewhat heightened in the context of a RIF because, "[a]s long as employers do not act with discriminatory intent, they may eliminate positions in the name of economic necessity or efficiency, even when those positions are held by [persons in a protected class]." *Wilson v. Firestone Tire & Rubber Co.*,

---

[4] "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within" the organization or entity. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990). While Dr. Li challenges the inclusion of her position in the RIF, she does not dispute that her termination occurred during a campus-wide workforce reduction.

932 F.2d 510, 517 (6th Cir. 1991). Discharge of a qualified employee within a protected class is not inherently suspicious because it is the nature of a RIF that some "qualified employees are going to be discharged." *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 896 (6th Cir. 1997) (citing *Barnes*, 896 F.2d at 1466).

If a plaintiff can establish each of the four elements of this *prima face* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason(s) for an adverse employment action. "If the employer meets its burden, the burden shifts back to the plaintiff to establish that the proffered reason was merely pretext for unlawful discrimination." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021) (citation omitted).

### B.  Plaintiff Cannot Demonstrate a *Prima Facie* Case of Discrimination

The parties agree that Dr. Li meets the first three elements of the *prima facie* case. (Doc. No. 27, at 14; *see* Doc. No. 34, at 16.) In particular, there is no dispute that Dr. Li is a member of a protected class by virtue of her race (Asian) and national origin (Taiwanese), that she was qualified for her position as a tenured professor at UA, and that she suffered an adverse employment action when her position was eliminated during the 2020 RIF. UA focuses on the fourth element of the *prima face* case, as modified for RIF actions, suggesting that Dr. Li can point to no facts that, if believed, would establish that she was "singled out" for disparate treatment on the basis of her race or national origin. In making its determination as to whether this requirement has been met, courts have been instructed that "[t]he guiding principle is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of" the plaintiff's membership in a protected class. *Barnes*, 896 F.2d at 1466.

14

Dr. Li concedes that neither Dean Tudor nor Dr. Lenhart made any comments to her that she found offensive on the basis of her race or national origin, nor did they advise her that her race or national origin played any role in the elimination of her position. (Doc. No. 26-1, at 30, 34.) She also offers no evidence that anyone else at UA uttered ethnic slurs or otherwise made offensive comments to her or in her presence.[5] (*Id*. at 34.) Instead, she attempts to meet the heightened fourth prong of the *prima face* case by offering statistical evidence relating to the RIF. Her "evidence" does not come in the form of a statistical analysis from an expert witness. Rather, Dr. Li simply reproduces the contents of a table that was created by Susan Ramlo, a professor at UA and the former vice president of the Akron-based AAUP local. (*See* Doc. No. 34, at 9 (Table 5, entitled "University-wide Bargaining Unit Faculty Demographics & Comparison to RIF").[6]) The table contains columns purporting to show a "head count" of the bargaining unit faculty, broken down by race, as well as a "head count" and percentages by race of those faculty members who were included in the RIF.[7] (*Id*.)

Relying on this table, Dr. Li notes that "[o]f the 96 bargaining unit members whose

---

[5] In her deposition, and again in her declaration, Dr. Li recounts an incident in 2017, during the prosecution of the union grievance filed by Dr. Li and several colleagues challenging the appointment of Dean Tudor. Dr. Li believed that the appointment violated the "shared governance" provision in Article 10 of the CBA because faculty were not asked for their input before the appointment was made. (Doc. No. 26-1, at 94.) According to Dr. Li, during a hearing on the grievance, then-Provost Rex Ramsier threatened to "sell" the College of Education to Kent State. (*Id*. at 172.) She testified that she and her colleagues found the statement inappropriate because Dr. Ramsier was suggesting that members of the College of Education were "basically his property[.]" (*Id*. at 33.) There is no evidence to suggest that Dr. Ramsier played a role in the decision to terminate Dr. Li's position, and the Court finds that this event does not represent *any* evidence of discriminatory animus relating to race (Asian) or national origin (Taiwanese).

[6] According to Dr. Li, the table was prepared by Dr. Ramlo in connection with AAUP's grievance over the RIF. (Doc. No. 34, at 17.)

[7] Dr. Li claims that she updated the table prepared by Dr. Ramlo "using records obtained from [UA] through public record requests." (Doc. No. 34, at 17.) She then offers an unfinished citation to her declaration in support. (*See id*.) From this description and incomplete citation, there is no way to know what portion of the table was "updated" by Dr. Li.

positions were abolished by [UA], 24% were of Asian descent, whereas, overall, 19.2% of bargaining unit members were of Asian descent." (Doc. No. 34, at 9 (citing Table 5).) She further notes that the table shows that while 72.5% of the bargaining unit faculty were Caucasian, only 67.7% of those subjected to the RIF were Caucasian. (*Id*. at 9–10.) She argues that this table, constructed by using "simple addition and division[,]" demonstrates that "[Dean] Tudor selected a greater percentage of bargaining unit members from race-based and national origin-based protected classes than from the White/Caucasian members of the bargaining unit." (*Id*. at 17–18.)

"Appropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class. To do so, the statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity." *Barnes*, 896 F.2d at 1466 (citations omitted). "[B]oth the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." *Id*. (quoting *Simpson v. Midland-Ross Corp*., 823 F.2d 937, 944 (6th Cir. 1987)).

Dr. Li's proffered statistics, which amount to nothing more than raw (and unsubstantiated) numbers,  fall far short of the type of statistical evidence that the court in *Barnes* and in subsequent Sixth Circuit cases found sufficient to establish a *prima facie* case under the heightened standard applicable in a RIF. In *Barnes*, the Sixth Circuit cautioned that any data relied on to support an inference of discrimination must be from a reliable source and must be of sound methodology. *Barnes*, 896 F.2d at 1466. Dr. Li fails to demonstrate that the methodology used to produce the table was sound. She does not offer an affidavit from Dr. Ramlo explaining how the data was compiled. Rather, Dr. Li simply suggests that the data was derived from UA documents obtained

through public records requests. (Doc. No. 34, at 17.) Beyond suggesting that these documents include "personnel records," she does not identify the source of the data, making it impossible for the Court to determine whether the data comes from a reliable source. In fact, Dr. Li conceded in her deposition that she had no idea how Dr. Ramlo determined the race and national origin of the bargaining unit members, and she further admitted that she has no personal knowledge of the race and national origin of any faculty member outside the LJFFSE. (Doc. No. 26-1, at 181 (Dr. Ramlo "did not explain the details of how she collected data" and "did not explain how she determined the race and national origin.").) Moreover, given that the table contains no names of the bargaining unit members, the lack of information regarding the methodology for collecting the data makes it impossible for the Court to determine whether the raw numbers that are reported are even accurate.

But assuming the raw numbers are accurate, Dr. Li has not articulated to the Court the significance of the statistics presented. She has failed to advance any analysis of the numbers in the table demonstrating how they establish evidence of discrimination. *Cf. Thompson*, 985 F.3d at 526 (noting that the Sixth Circuit has "upheld inferences of discrimination where data are offered *alongside analyses describing their statistical significance*." (emphasis added)). Dr. Li has not provided *any* qualified analysis explaining the statistical significance of the data she offers. And the fact that the percentages were derived through "simple addition and division" does not excuse her failure to demonstrate that the percentages are statistically significant. *See Pio v. Benteler Auto. Corp.*, No. 21-1231, 2022 WL 351772, at *4–5 (6th Cir. Feb. 7, 2022) (rejecting reliance on calculations of raw employee data performed by counsel using "4th grade math," finding them "comparable to the statistics rejected by the *Thompson* court: it is not presented by an expert and is not accompanied by a statistical analysis") (citing *Thompson*, 985 F.3d at 526).

Given the fact that the percentage of Asians included in the RIF appears to be only marginally higher than the percentage in the bargaining unit as a whole, and in the absence of any evidence illustrating the statistical significance of this slight difference, the Court finds that Dr. Li's evidence fails to show that something other than random chance, such as race or national origin, accounts for the difference.[8] *Compare Thompson*, 985 F.3d at 527 (finding statistical evidence limited to a compilation of the average age of employees laid off during a RIF, the average age of all those considered for termination, and the average age of those retained insufficient, in part, because the plaintiff did not "provide[] any analysis explaining the statistical significance of the data"); *with Scott v. Goodyear Tire & Rubber Co*., 160 F.3d 1121, 1129 (6th Cir. 1998) (plaintiff's statistical evidence indicated that age played a part in reduction-in-force as there was a seven-year difference between employees eliminated and retained and plaintiff's experts testified that there was less than a 1% chance that the discrepancy was due to randomness). It is, therefore, insufficient to establish a *prima facie* case of discrimination.[9] *See, e.g., Brown v. EG & G Mound Applied Tech., Inc*., 117 F. Supp. 2d 671, 679 (S.D. Ohio 2000) (rejecting data showing a "snapshot" of the employer's demographics before and after a RIF as insufficient, as a

---

[8] The corollary is also true. The percentage of Caucasian bargaining unit members affected by the RIF is only marginally lower than the percentage of Caucasians in the bargaining unit as a whole. Without competent statistical analysis, the Court cannot determine the evidentiary significance of these percentages.

[9] To the extent Dr. Li also relies on data limited to the School of Education (*see* Doc. No. 34, at 10–11), these "statistics" fail for the same reason: they are not accompanied by analysis demonstrating their statistical significance. This evidence also suffers from another fatal flaw: it is based on too small a sample. The Sixth Circuit has found "relatively small sample sizes to be suspect and incapable of supporting an inference of discrimination." *Thompson*, 985 F.3d at 526 (comparing cases finding sample sizes of 27 and 17 to be insufficient and "suspect" with cases finding sample sizes of 153 and 165 to be sufficiently reliable (collecting cases)). While three of the six individuals Dean Tudor selected for inclusion in the RIF were members of a race or national origin-based protected class (*see* Doc. 34, at 11), the Court finds the sample size of six employees "too small to provide reliable data." *Thompson*, 985 F.3d at 527. The sample size becomes even smaller if Dr. Tsai is eliminated from the pool as she was ultimately recalled to her position with UA. Once again, Dr. Li's statistical evidence is insufficient to demonstrate that she was singled out because of her race or national origin.

matter of law, to establish a *prima facie* case of race and age discrimination).

### C. Plaintiff Cannot Establish Pretext

If Dr. Li had managed to set forth a *prima facie* case of race and/or national origin discrimination, the burden would have shifted to UA to articulate a legitimate non-discriminatory reason. As previously noted, UA cites the campus-wide RIF brought on by the projected $65 million deficit due, in part, to the COVID-19 pandemic as the basis for the RIF. "When work force reductions by the employer are a factor in the decision, 'the most common legitimate reasons' for the discharge are the work force reductions." *Barnes*, 896 F.2d at 1465. Dr. Li concedes that UA "has articulated a legitimate, nondiscriminatory reason for including [Dr.] Li in the RIF, however, [Dr.] Li contends the articulated reason is pretext for [UA's] true motive, intentional discrimination."[10] (Doc. No. 34, at 18.)

"When an employer offers nondiscriminatory reasons for an adverse employment action, the burden shifts back to the employee to prove that the stated reason for her termination is pretextual." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012). At this stage, it is not enough for the plaintiff to merely question the reasons given by her employer. Rather, the plaintiff must affirmatively prove that the reasons are "*in fact a coverup for a racially [or ethnic-based] discriminatory decision*." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517, 519, 113 S.

---

[10] While Dr. Li claims she is not challenging the economic basis for the RIF, she suggests in her opposition brief that the RIF merely provided a convenient opportunity for UA to cut costs. (*See* Doc. No. 34, at 4.) She offers no evidence from the record that would support such a representation. She also testified in her deposition that she believed that UA was forecasting a $60 million deficit as early as 2014 but conceded she did not remember where she acquired this information. (Doc. No. 26-1, at 66–67.) And, in any event, an employer's burden at this stage is one of production, not persuasion; it need only state a reason, not prove one. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *see Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) ("This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment." (citation omitted)). The Court finds UA has satisfied its burden by articulating a legitimate, non-discriminatory reason.

Ct. 2742, 125 L. Ed. 2d 407 (1993) ("It is not enough, in other words, to *dis* believe [sic] the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (emphasis in original) (citation omitted)). On summary judgment, therefore, a plaintiff must come forward with facts that, if believed, would support a finding that the proffered reason was merely a pretext for unlawful discrimination.

To establish pretext, a plaintiff may show that the defendant's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Thompson*, 985 F.3d 522 (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003)). Dr. Li acknowledges these three ways in which a plaintiff can show pretext, but she fails to identify the ones upon which she relies. (*See* Doc. No. 34, at 18, 19 (Dr. "Li has presented evidence from which a jury could find that the reasons for including her in the RIF are not the true reasons and are merely pretext[ual].)"[11]) What is clear, however, is that she questions the three reasons given by UA for her inclusion in the RIF: (1) she no longer belonged to a program, (2) her salary was higher than others in LJFFSC, and (3) she had limited versatility in the classes she could teach.

### 1. Dr. Li Was No Longer Affiliated With a Program

In her deposition, Dr. Li argued that the first rationale advanced by Dean Tudor—that she was not associated with a particular program—was false, in part, because UA did not have a written

---

[11] Dr. Li states that she believes that the reasons given by UA are "merely pretext for *retaliation*." (*Id*. at 18 (emphasis added).) The Court assumes that her reference to "retaliation" was in error. Dr. Li has not brought a retaliation claim under Title VII, or otherwise plead factual allegations that would suggest that she was discriminated against in retaliation for her exercising any rights. (*See generally* Doc. No. 1.) In her deposition, she suggested that Dr. Ramsier, who played no role in the RIF decisions involving the LJFFSC, was "not pleased" with the fact that she and colleagues filed a union grievance in 2016. (Doc. No. 26-1, at 172.) To the extent that she now claims that her discharge was retaliatory in nature, such an argument counsels against a finding that it was actually a pretext for race and/or national origin discrimination.

operational definition for the term "program." (Doc. No. 26-1, at 192.) She concedes that she eventually understood Dean Tudor to be referring to whether she was advising a program requiring licensing, such as special education.[12] (*Id.* at 191–94; *see* Doc. No. 24-1, at 18 (discussing "special education" as a "program"), 20–21 (identifying "early childhood education", "AYA" [which relates to licensing for 7th through 12th grades], and "special education" as programs). Nevertheless, she challenges Dean Tudor's "elusive" definition and suggests that UA should have considered her to be associated with, or belonging to, every educational program because she taught Introduction to Education, a prerequisite for all education-based programs. (Doc. No. 26-1, at 192–94.)

Because Dr. Li does not suggest that she was qualified to teach classes in any of the remaining licensure programs—such as special education or early childhood education—she cannot demonstrate that Dean Tudor's first reason for her inclusion in the RIF has no basis in fact. (*See* Doc. No. 24-1, at 20–21; Doc. No. 25-1, at 38–39.)  Further, she cannot establish pretext by offering an alternative definition of the word "program" and suggesting that UA should have considered her associated with every program because she taught a required general introduction course. A plaintiff "cannot rebut an employer's proffered explanation by proposing [her] own rubric of relevant qualifications and testing the employer's conduct against it." *Trapp v. TSS Techs., Inc*. 485 F. App'x 757, 760 (6th Cir. 2012). "It is not the prerogative of the courts to engage in the post-hoc management of the employer's internal affairs by second-guessing how personnel

---

[12] In fact, in an email dated July 17, 2020, to Dr. Welton, another LJFFSE faculty member who was subject to the RIF, Dr. Li indicated that she thought Dr. Welton had a stronger case than her for wrongful termination because she [Dr. Li] did "not have a program." (Doc. No. 26-1, at 190.) When asked in her deposition what she meant by her statement, she explained that she was applying Dean Tudor's definition of "program" as relating to a course of study for which one could obtain a teaching license. (*Id.* at 191.)

could have been more equitably allotted, or cost-savings better realized. . . . [the plaintiff] must provide evidence not that [the defendant] could have made a business decision that others might think more fair [sic], but that [the defendant] made the decision to terminate [her] because of [her] membership in a protected class." *Norbuta v. Loctite Corp*., 1 F. App'x 305, 314–15 (6th Cir. 2001). Dr. Li has not established that UA's first reason had no basis in fact.

Dr. Li also attempts to establish pretext by pointing to the fact that other faculty within LJFFSE, including Drs. Susi Kushner-Benson, Kristen Koskey and Xin Liang, had their programs eliminated but were not subject to the RIF. Yet, Dr. Li concedes that Dr. Kushner-Benson served a unique role in LJFFSE because she was the program lead for the I Promise School—the school founded by the Lebron James Family Foundation—and that the foundation actually paid part of her salary. (Doc. No. 26-1, at 148–49; *see* Doc. No. 24-1, at 25–26; Doc. No. 27-1 ¶ 11.) Dr. Kushner-Benson was also qualified to teach courses on special education, whereas Dr. Li was not. (Doc. No. 27-1 ¶ 11.) It is also undisputed that Dr. Liang was the only statistician left in LJFFSE and was responsible for accreditation in addition to her teaching duties.[13] (Doc. No. 24-1, at 34; Doc. No. 25-1, at 28–29; *see also* Doc. No. 24-1, at 42–43 (noting that accreditation is always one of the most important considerations for a college or university). As for Dr. Koskey, Dr. Li conceded that Dr. Koskey had already been transferred to the College of Health Professionals by the time of the RIF, so it would have been illogical for Dean Tudor to have included her in his recommendations regarding LJFFSE faculty terminations.[14] (Doc. No. 26-1, at 136.)

---

[13] In her opposition brief, Dr. Li acknowledges that Dr. Liang is of Asian descent. (*See* Doc. No. 34, at 10.) The more favorable treatment of another member of the protected class does nothing to advance Dr. Li's pretext argument.

[14] Additionally, as previously noted, Dr. Tsai, a LJFFSE faculty member of Asian descent whose position was also initially eliminated due, in part, to the fact that her program had been eliminated, was eventually recalled when Dr.

Because Dr. Li has not established that she was similarly situated to these employees, the retention of these employees would not even meet the fourth prong of the *prima facie* case, let alone establish pretext.[15] *See Mitchell*, 964 F.2d at 583 (noting that "[i]t is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparable' are similarly situated *in all respects*." (emphasis in original) (citation omitted)). Furthermore, the fact that Dr. Coyner, a Caucasian woman who was born in the United States, was also selected for termination because her program had been eliminated serves only to further discredit Dr. Li's claim that she was terminated on the basis of race and/or national origin. (Doc. No. 24-1, at 28–30; Doc. No. 25-1, at 17.) *See Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999) (finding a trial jury cannot find an inference of discrimination when the evidence shows that similarly situated, non-minority employees were treated the same); *see also, e.g., Agee v. N.W. Airlinse, Inc*., 151 F. Supp. 2d 890, 893–94 (E.D. Mich. 2001) (finding that plaintiff was unable to establish discrimination when evidence showed that plaintiff was treated the same as similarly situated individuals outside the protected class).

### 2. *Dr. Li Had One of the Highest Salaries In the LJFFSE*

The second reason given by Dean Tudor for Dr. Li's inclusion in the RIF was the fact that she had one of the highest salaries among LJFFSE faculty members. (Doc. No. 27-1 ¶ 8.) When asked in her deposition why this reason had no basis in fact, Dr. Li stated that her salary was not

---

Koskey left LJFFSE. The favorable treatment of Dr. Tsai, another Asian employee, demonstrates that the real motivation for Dr. Li's termination was not unlawful race and/or national origin discrimination.

[15]As compared to the *prima facie* stage, using comparisons to non-protected employees at the pretext stage requires an even closer correlation between the plaintiff and her comparators. *See also Miles v. S. Cent. Hum. Res. Agency, Inc*., 946 F.3d 883, 893 (6th Cir. 2020) (explaining that a plaintiff can show pretext by presenting evidence that other employees outside the protected class engaged in "substantially identical" conduct).

higher than that of Dr. Lenhart and Dr. Kushner-Benson. (*See* Doc. No. 26-1, at 161.) Yet, Dean Tudor never represented or stated that Dr. Li had the *highest* salary in LJFFSE. (*See* Doc. No. 26-1, Ex. L, at 547.) And it is undisputed that Dr. Li had the fifth highest salary in LJFFSE. (Doc. No. 27-1 ¶ 11.) The four faulty members who had higher salaries were Dr. Lenhart, Dr. Coyner, Dr. Welton, and Dr. Kushner-Benson. (*Id*.) From the record, it is clear this reason has a basis in fact.

Yet, Dr. Li tried to cast doubt that this reason truly motivated the decision to eliminate her position by noting that Drs. Lenhart and Kushner-Benson, despite their comparatively high salaries, were retained. (Doc. No. 26-1, at 161.) Again, Dr. Li has not demonstrated that she was similarly situated to Dr. Kushner-Benson. Dean Tudor averred Dr. Kushner-Benson "maintained a unique position [as the lead for the I Promise School] that was crucial to the relationship LJFFSE maintained with the LeBron James Family Foundation." (Doc. No. 27-1 ¶ 11.) Additionally, Dean Tudor did not include Dr. Lenhart's position in the RIF because she was the department chair and "LJFFSE needed to maintain continuity in leadership." (*Id*.) This fact, alone, renders Dr. Li dissimilar to Dr. Lenhart in a material respect.[16]  Of course, the fact that two of the remaining faculty members with the highest salaries—Drs. Welton and Coyner, both Caucasians born in the United States—were also discharged, in part, because of their significant salaries, effectively prevents Dr. Li from establishing that her higher salary was not a true motivation for or otherwise sufficient to support her termination. (Doc. No. 24-1, at 29–30 (stating that Dr. Welton and Dr. Coyner were selected for termination, in part, because of their "high" salaries); Doc. No. 27-1 ¶ 11.) *See Primes*, 190 F.3d at 767; *see also, e.g., Agee*, 151 F. Supp. 2d at 893–94.

---

[16] Dean Tudor also indicated that he did not include Dr. Lenhart's position in the RIF because she maintained a substantial teaching load. (*Id*.)

### 3.  *Dr. Li Had Limited Teaching Versatility*

In his deposition, and again in his declaration, Dean Tudor explained that the third reason he included Dr. Li's position in his list of recommended position eliminations was the fact "she had limited teaching versatility—she taught foundational courses that could readily be staffed with the remaining LJFFSE faculty." (Doc. No. 24, at 20–21; Doc. No. 27-1 ¶ 8; *see* Doc. No. 26-1, Ex. L, at 546.) While he explained that Dr. Li was capable of teaching the foundational courses (such as Introduction to Education), she was not qualified to teach the specialized classes in CIS. (Doc. No. 27-1 ¶ 10; *see* Doc. No. 24-1, at 20–21.) Given that virtually every LJFFSE faculty member was qualified to teach Introduction to Education, Dean Tudor believed that the elimination of Dr. Li's position would not pose any scheduling problems going forward. (Doc. No. 27-1 ¶ 8; *see* Doc. No. 25-1, at 15; Doc. No. 26-1, Ex. L, at 546.)

In her deposition, Dr. Li suggested that, from "her perspective," current staff members who did not have her background in fundamentals of education, particularly in the areas of sociology and history of education, were not qualified to teach Introduction to Education. (Doc. No. 26-1, at 207–09.) A plaintiff's subjective views of her qualifications, in relation to her coworkers, without more are insufficient to establish discrimination. *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 268–69 (6th Cir. 2010); *see Snyder v. Pierre's French Ice Cream Co*., 589 F. App'x 767, 771 (6th Cir. 2014) (a plaintiff's reliance on her own personal beliefs and opinions is not sufficient to show pretext). Dr. Li eventually conceded that any faculty member with a graduate degree in education is objectively qualified to teach this course. (Doc. No. 26-1, at 210; *see* Doc. No. 25-1, at 15–16 (noting that anyone at UA in the field of education could teach Introduction to Education).) Dr. Li has failed to point to facts that would support a finding that this third reason

had no basis in fact, that it did not truly motivate, or that it was otherwise insufficient to justify the decision to eliminate her position.[17]

### 4.   Dr. Li Has Offered No Other Evidence of Pretext

Finally, Dr. Li points to her treatment by Dr. Lenhart after her termination. Specifically, she notes that she was initially denied adjunct professor status by Dr. Lenhart, and that Dr. Lenhart would not permit her to teach a graduate level course "students had signed up for, while calling [Dr.] Razek back to teach two graduate level courses[.]" (Doc. No. 34, at 20.) In support of these arguments, Dr. Li relies heavily upon her sham declaration.

According to Article 15 of the CBA, UA was contractually required to make part-time positions available to bargaining unit members whose positions were eliminated during the RIF. (Doc. No. 26-1, Ex. G, Art. 15, § 10.) Regardless of whether her initial request to teach part-time was denied, Dr. Li concedes that she was ultimately permitted to teach courses on a part-time basis starting in the spring 2021, and she has continued to teach as an adjunct professor every semester since. (Doc. No. 26-1, at 42.) A short dispute over post-termination classes, that was subsequently resolved in favor of Dr. Li, does not demonstrate that the prior decision to eliminate her position during the RIF was pretextual. Additionally, while she complains that she was not permitted to teach an upper-level course that "students had signed up for," she does not dispute that there were only seven students signed up for the class and that Dr. Lenhart ultimately canceled it. (Doc. No. 26-1, at 159–60.) Moreover, her comparison to Dr. Razek, another minority faculty member whose

---

[17] Dr. Li also offers the declaration of Dr. Noll—a Caucasian female, born in the United States—who maintains that Dean Tudor advised her that she was included in the RIF because she had the highest salary of all literacy faculty and because she had limited teaching versatility. (Doc. No. 34, Declaration of Hueyli Li, Ex. 2 (Declaration of Brandi L. Noll, Ph.D.) ¶ 4.) Similar treatment of an individual outside the protected class prevents Dr. Li from establishing pretext for race and/or national origin discrimination. *See Primes*, 190 F.3d at 767; *see also, e.g.*, *Agee*, 151 F. Supp. 2d at 893–94.

position was eliminated during the RIF, does not demonstrate that the cancellation of her graduate-level class was the result of unlawful race and/or national origin discrimination. Even if her sham affidavit was properly before the Court, it would not have demonstrated pretext.[18]

## IV. CONCLUSION

Ultimately, the Court finds that Dr. Li has failed to establish the existence of a *prima facie* case of race or national origin discrimination. In particular, she has failed to set forth facts that, if believed by a jury, would establish that she was singled out for termination on the basis of her race or national origin. She has also failed to demonstrate the existence of genuine issues of material fact regarding whether UA's stated reasons for discharging her during a financially driven RIF were merely pretext for unlawful discrimination. Accordingly, her race and/or national origin claim fails as a matter of law, UA's summary judgment motion is granted, and Dr. Li's complaint is dismissed with prejudice. This case is closed.

**IT IS SO ORDERED**.

Dated: June 22, 2023

_____
**HONORABLE SARA LIOI
UNITED STATES DISTRICT COURT
CHIEF JUDGE**

---

[18] Dr. Li also offers the statistical evidence she unsuccessfully relied upon at the *prima facie* stage as an attempt to establish pretext. (Doc. No. 34, at 20.) Even if such evidence was sufficient to establish a *prima facie* case (which it was not), standing along this would not have been sufficient to demonstrate pretext. "As the Sixth Circuit noted in *Barnes*, even if statistics are sufficient to sustain a plaintiff's *prima facie* case, statistics alone cannot serve to demonstrate pretext where 'the statistics do[] not tend to establish that [race or national origin] played a factor in any *particular* decision.'" *Anderson v. Otis Elevator Co.*, 923 F. Supp. 2d 1032, 1074 (E.D. Mich. 2013) (quoting *Barnes*, 896 F.2d at 1469 (emphasis in *Barnes*)).